IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRENDA L. BONK,** | : | **Civil No.  1:21-CV-1529** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Brenda Bonk's Social Security appeal calls upon us to consider longstanding principles regarding the duty of an Administrative Law Judge (ALJ) to fully articulate the basis of a residual functional capacity (RFC) assessment, particularly in a case such as this one, where the plaintiff's treatment providers assessed significant limitations with respect to her mental and emotional impairments.

Brenda Bonk asserted that she was disabled due to a number of impairments, including depression, anxiety, and post-traumatic stress disorder ("PTSD").[1] In the decision denying Bonk's disability application, the ALJ discounted the opinions of

---

[1] Bonk's appeal focuses on the ALJ's treatment of her mental and emotional impairments, and as such, this Memorandum Opinion will focus only on those impairments.

Bonk's treating therapist and physician assistant in favor of the state agency, non-examining, consulting opinions. However, in our view, the ALJ failed to adequately articulate the reasoning for the persuasiveness assigned to these opinions. Particularly, the ALJ discounted the marked to extreme limitations set forth in the opinions of Marian Yoder and Samantha Cummins, PA-C, in favor of the non-examining, state agency consulting opinions which opined that Bonk was only mild to moderately limited in these areas of functioning. The ALJ did so based largely on what were described as normal mental status examination findings during the relevant period, as well as references to activities of daily living that the ALJ found were not consistent with the marked to extreme limitations in those treating opinions. However, our review of the record leads us to conclude that the ALJ's decision failed to address, analyze, or even acknowledge countervailing evidence regarding Bonk's impairments, such as the physical manifestations of her anxiety on several occasions, her history of agoraphobia, and her limitations regarding her activities of daily living, all of which were documented by her treatment providers.

In our view, more is needed here since it is well settled that "an ALJ may not 'cherry pick' results that support his conclusion and ignore those that do not." Edinger v. Saul, 432 F.Supp.3d 516, 529 (E.D. Pa. 2020) (internal citations and quotations omitted). Specifically, we find that the ALJ in the instant case failed to

2

adequately explain his reasoning for discounting the treating source opinions in favor of the non-examining, state agency consulting opinions, and failed to discuss the substantial countervailing evidence with respect to Bonk's mental and emotional impairments. Accordingly, because we conclude that the ALJ's burden of articulation has not been met in this case, we will remand this case for further consideration by the Commissioner.

## II.   Statement of Facts and of the Case

On September 20, 2019, Brenda Bonk applied for disability insurance benefits and supplemental security income, alleging an onset date of August 15, 2019. (Tr. 76). Bonk alleged disability due to a host of impairments, including depression, anxiety, and PTSD. (Tr. 145). Bonk was 44 years old at the time of the alleged onset of her disability, had at least a high school education, and had past work as a licensed practical nurse. (Tr. 89).

With respect to her mental and emotional impairments, the medical record revealed the following: In June of 2019, just prior to her alleged onset date, Bonk was referred by her primary care physician for therapy and medication management for her major depressive disorder and panic disorder. (Tr. 570). Around this time, Bonk was seen at the emergency room complaining of abdominal pain, nausea, and vomiting, which treatment notes indicated could be related to her anxiety. (Tr. 529).

At an office visit with her primary care physician in July of 2019 for a follow-up after her ER visit, it was noted that she had a severe panic attack which was followed by chest pain and vomiting. (Tr. 586). On examination, her mood and affect were euthymic and appropriate, and her memory was intact. (Tr. 587).

In September of 2019, Bonk again was seen in the ER, where it was noted that her symptomology was consistent with panic attacks in the setting of depression. (Tr. 520). Around this time, Bonk began treating with Marian Yoder, M.A., at the Aaron Center for her depression, anxiety, and PTSD. (Tr. 547). Intake notes indicate that Bonk had recently lost her brother and her dog, and that she reported experiencing frequent flashbacks to childhood trauma. (Id.) These notes also detailed a significant history of past trauma and abuse, noting that she was raised by her grandparents who psychologically abused her, and that she had been on medication management with her primary care provider for ten years. (Tr. 549). A mental status examination at this time was within normal limits. (Tr. 552-53). Ms. Yoder diagnosed Bonk with panic disorder, generalized anxiety disorder, major depressive disorder, and PTSD. (Tr. 555).

Bonk underwent a mental status evaluation with Dr. Jennifer Betts, Psy.D., in December of 2019. (Tr. 631-40). Bonk reported beginning outpatient treatment at the Aaron Center once per week, and that she had no history of psychiatric

hospitalizations. (Tr. 632-33). Bonk stated that she experienced panic attacks, crying spells, fatigue, and social withdrawal. (Tr. 634). On mental status examination, Bonk was cooperative, her speech was fluent and clear, her thought processes were coherent and goal directed, and her mood and affect were anxious. (Tr. 635). Dr. Betts noted that Bonk's attention and concentration were mildly impaired due to her anxiety, as was her recent and remote memory. (Tr. 635-36). Dr. Betts further noted that Bonk's insight and judgment were fair to poor, in that her anxiety prevented her from receiving appropriate treatment. (Tr. 636). Dr. Betts diagnosed Bonk with agoraphobia with panic and PTSD, and noted her prognosis was guarded due to worsening agoraphobic symptoms. (Tr. 636-37).

Dr. Betts also filled out a medical source statement, in which she opined that Bonk had moderate limitations in carrying out even simple instructions due to her agoraphobia and panic disorders; had marked limitations in interacting appropriately with the public and responding to usual work situations and changes in a routine work setting; and that her ability to adapt and manage oneself, as well as her ability to concentrate, persist, and maintain pace were affected by her impairments due to her "poor ability to cope with agoraphobia [and] anxiety in order to participate in treatment." (Tr. 638-39).

In February of 2020, Bonk presented to the emergency department complaining of palpitations. (Tr. 663). She reported that she had not been eating or drinking due to her depression, and that she had lost 35 pounds. (Id.) She further reported waking up and experiencing a panic attack, and her heart rate was 201bpm. (Id.) An ECG noted sinus tachycardia. (Tr. 668).

At a telehealth visit with her Behavioral Health Case manager in April of 2020, Bonk reported increased anxiety and "fair" depression. (Tr. 726). It was noted that her mood was anxious and her depression was at baseline. (Id.) At a follow up one week later, Bonk reported that her symptoms were not worse but she experienced symptoms daily. (Tr. 725). Her mood was noted to be depressed, and it was further noted that she was actively treating with the Aaron Center. (Id.) In May of 2020, treatment notes indicate that Bonk was tearful throughout the conversation, and she reported beginning a new form of therapy that brought out a lot of feelings. (Tr. 724).

In June of 2020, Bonk reported continued depression and anxiety and her mood was depressed. (Tr. 722). Later that month, Bonk again presented to the emergency department in complaining of anxiety. (Tr. 716). It was noted that she was tearful, reported losing weight consistently for six months, and that therapy was

increasing her anxiety. (Tr. 717). She presented with a dysphoric mood and was nervous/anxious. (Id.) Her psychiatric examination was otherwise normal. (Tr. 719).

Around this same time, Ms. Yoder filled out a medical source statement regarding Bonk's ability to do work-related activities. (Tr. 783-84). Ms. Yoder opined that Bonk was marked to extremely limited in her ability to do unskilled work, including maintaining regular attendance, maintaining attention, making simple work-related decisions, performing at a consistent pace, and responding appropriately to changes in the work setting. (Tr. 783). Ms. Yoder further opined that Bonk experienced extreme limitations in her ability to interact with others and her ability to do semi-skilled work. (Tr. 784). Further, Ms. Yoder marked that Bonk would be absent more than three times per month and noted Bonk's limitations with respect to transportation due to her panic attacks. (Id.)

Additional treatment notes from June of 2020 indicate that Bonk felt her therapy was helping some, but it was bringing back a lot of memories that increased her anxiety and agoraphobia. (Tr. 794). CRNP Ries noted that Bonk had tried to go to church and volunteer, but that she left as soon as she got there because she was so anxious, and that when she got home, she threw up. (Id.) Bonk was noted to be tearful during the interview, and she had lost 40 pounds due to a loss of appetite.

(Id.) On examination, her mood was anxious and fearful, but her cognition was otherwise normal. (Tr. 796).

In July of 2020, Bonk followed up with CRNP Ries, stating that she was "not that good." (Tr. 790). Bonk was very tearful and described fighting with her husband. (Id.) CRNP Ries noted that Bonk was getting out of the house. (Id.) Treatment notes from later in July indicate that Bonk had tried a new medicine, and that she had been letting some fears go. (Tr. 872). Bonk was not tearful at this visit, and it was noted that she had been driving short distances. (Id.)

Bonk reported doing a little better in September, and she stated that she experienced a few good days but then would backtrack. (Tr. 886). She had noticed improvement in her mood and she was trying to step out of her comfort zone, and treatment notes indicate that she had gone for a trail walk but had a panic attack. (Id.) Bonk reported plans to volunteer at a homeless shelter. (Id.) A mental status examination at this time was largely unremarkable. (Tr. 887). Later in September, Bonk reported that she was not sleeping and was very depressed. (Tr. 892).

In October, treatment notes indicate that Bonk had gone off of her medications because they made her tired and she wanted to get a job. (Tr. 896). She was noted to be very emotional and reported that she was afraid of being hospitalized and having no one to take care of her pets. (Id.) Her mood was noted to be deeply melancholic,

depressed, and sad, but otherwise her mental status examination was normal. (Id.) Treatment notes from November indicated that Bonk was afraid to switch her medications due to a fear of overdosing like her brother had. (Tr. 33). Bonk reported frequent crying spells, and it was noted that her mood was sad. (Tr. 34-35). On examination, her attention, concentration, judgment, and insight were fair. (Tr. 35). Treatment notes from December indicate that Bonk was very sad and was not in control of her emotions. (Tr. 37). At a visit later in December, it was noted that Bonk was feeling more emotional and angry lately. (Tr. 39).

Ms. Yoder filled out an interrogatory in December of 2020, in which she opined that Bonk's condition was worse. (Tr. 982). Ms. Yoder stated that Bonk experienced daily symptoms of her PTSD, panic disorder, depressive disorder, and anxiety, and that these impairments manifested physically when she tried to leave her house. (Id.) Ms. Yoder opined that Bonk's conditions had worsened in the last 6 months. (Id.)

PA-C Cummins also filled out a medical source statement in December of 2020. (Tr. 986-87). Ms. Cummins opined that Bonk experienced marked to extreme limitations in her ability to do unskilled and semi-skilled work. (Id.) Ms. Cummins indicated that Bonk would be absent from work three or more times per month. (Tr. 987). Ms. Cummins further indicated that her assessment was based on her treatment

notes, clinical observations, mental status examinations, and review of Bonk's records. (Id.)

Bonk continued to treat for her emotional impairments, and in January of 2021, reported that she was receiving no benefit from Seroquel, and that she continued to have a negative mood, paranoia, and distrust of others. (Tr. 41). On examination, her mood was sad, her speech was clear but tearful, and she exhibited cognitive distortion, depression, and preoccupations. (Tr. 42-43). Her attention, concentration, judgment, and insight were fair. (Tr. 43). Mental status examinations from later in January and in February were largely unremarkable other than Bonk's mood, which was consistently noted to be depressed and sad. (Tr. 45, 47, 49, 51). At a visit with PA-C Cummins in February, Bonk's attention, concentration, insight, and judgment were noted to be fair, and she reported that she was struggling to concentrate, she was avoiding activities and conversations with other people, and frequent sadness. (Tr. 53-54). In March, Bonk's mental status examinations were relatively normal, and she reported issues with her husband as well as ongoing depression. (Tr. 62-67).

It was against this clinical backdrop that an ALJ conducted a hearing regarding Bonk's disability application on December 7, 2020. (Tr. 97-144). Bonk and a vocational expert appeared and testified. (Id.) In her testimony on December

10

7, Bonk described the severity of her emotional impairments. On this score, she testified that she was foregoing surgery on her back because of her high levels of anxiety (Tr. 115); that she at times had to call out of work when she was working because she would have panic attacks while driving (Tr. 117-18); that she avoids conversations with others because she is tearful and cannot control her emotions (Tr. 118-19); and that her husband drove her to the emergency room on several occasions due to anxiety-related symptoms that manifested physically, including a high heart rate. (Tr. 123-24). With respect to her activities of daily living, Bonk testified that she tried to volunteer at a shelter because her therapist suggested she try to get out of her comfort zone, but that she became embarrassed and tearful and had to leave. (Tr. 122). She further noted that she attempted to go for a trail walk by herself but experienced a panic attack. (Tr. 130).

Following this hearing on March 2, 2021, the ALJ issued a decision denying Bonk's application for benefits. (Tr. 76-91). In that decision, the ALJ first concluded that Bonk satisfied the insured status requirements of the Act through December 31, 2024, and she had not engaged in substantial gainful activity since her alleged onset date. (Tr. 78). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Bonk suffered from the following severe emotional impairments:

PTSD, generalized anxiety disorder, panic disorder, and major depressive disorder. (Tr. 79).

At Step 3, the ALJ determined that Bonk did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 79-82). The ALJ considered Listings 12.04, 12.06, and 12.15 relating to Bonk's mental impairments. (Tr. 80). The ALJ then found that Bonk's impairments did not meet the "paragraph B" criteria, as the ALJ found only moderate limitations in the four broad areas of functioning. (Tr. 80-82).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Bonk's limitations from her impairments:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations. The claimant must be given the opportunity to alternate between sitting and standing at least every 30 minutes. The claimant is limited to occasional stooping, kneeling, crouching, and climbing on ramps and stairs, but may never balance, crawl, or climb on ladders, ropes, or scaffolds. She must avoid unprotected heights and dangerous moving machinery. She is limited to simple routine tasks, but not at a production rate pace. She is limited to occupations requiring no more than simple work related decisions with no more than occasional changes in the work setting. She is limited to occasional interaction with supervisors, coworkers and the public.

(Tr. 82).

In reaching this conclusion, the ALJ stated that he considered the medical records, Bonk's subjective complaints, and the medical opinion evidence. On this score, the ALJ considered the opinions of Dr. Murphy and Dr. Cloutier, the state agency consultants, who opined that Bonk experienced no more than moderate limitations in the "paragraph B" criteria. (Doc. 86). The ALJ found these opinions generally persuasive in that they were consistent with the longitudinal records that reflected no more than moderate limitations and unremarkable findings. (Id.) The ALJ also considered the opinion of Dr. Betts, the examining source, and found this opinion partially persuasive. (Tr. 87). The ALJ reasoned that Dr. Betts' opinion regarding moderate limitations was consistent with the longitudinal record, but that her opinions regarding Bonk's marked limitations were not consistent because mental status examinations in the record were largely normal. (Id.)

The ALJ then considered the opinions of Marian Yoder and Samantha Cummins and found these opinions unpersuasive. (Tr. 87-88). Regarding Ms. Yoder's opinions rendered in June and December of 2020, the ALJ found that Ms. Yoder's marked and extreme limitations, as well as her opinion that Bonk would be absent three or more days per month, were unsupported by and inconsistent with the medical evidence. (Tr. 87). The ALJ reasoned that many mental status examination findings were unremarkable, and that Bonk underwent consistent treatment with no

13

referral to any inpatient services. (Id.) The ALJ also reasoned that there was no evidence in the record to indicate that Bonk would be absent from work three times per month. (Id.) The ALJ rejected Ms. Cummins' opinion, which consisted of similar marked and extreme limitations, for the same reasons that he found Ms. Yoder's opinions unpersuasive. (Tr. 88).

The ALJ also considered Bonk's subjective complaints regarding her symptoms but found that she was not as limited as she alleged. (Tr. 83-84). The ALJ again relied on the findings in the record of largely normal mental status evaluations, as well as the absence of any referrals to inpatient treatment or hospitalizations. (Tr. 84). The ALJ further noted that Bonk's activities of daily living included her ability to tend to her personal care and household needs, as well as occasions where Bonk left her house despite her testimony that she rarely left her house. (Tr. 86).

The ALJ then found at Step 4 that Bonk could not perform her past work as an LPN but found at Step 5 that Bonk could perform work in the national economy as a sorter, marker, and packer. (Tr. 89-90). Having reached these conclusions, the ALJ determined that Bonk had not met the demanding showing necessary to sustain her claim for benefits and denied her claim. (Tr. 91).

This appeal followed. (Doc. 1). On appeal, Bonk challenges the adequacy of the ALJ's explanation of this RFC determination, arguing that the ALJ erred in his

assessment of the medical opinion evidence. Specifically, Bonk contends that the ALJ erred in discounting the opinions of her treating therapist and physician assistant, who opined that Bonk had marked to extreme limitations, in favor of the non-examining state agency consulting opinions. After consideration, we find that the ALJ failed to adequately articulate the basis for his RFC determination, specifically as it relates to the persuasiveness afforded to these various medical opinions. Accordingly, we conclude that the ALJ's burden of articulation has not been met in this case, and we will remand this case for further consideration by the Commissioner.

## III.   <u>Discussion</u>

### A. <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial

evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks

omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are

enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply

determine whether substantial evidence supported the ALJ's findings. However, we

must also ascertain whether the ALJ's decision meets the burden of articulation

demanded by the courts to enable informed judicial review. Simply put, "this Court

requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc.

Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted

on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "Burnett does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

**B.**   **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed

impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D.

Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." <u>Biller</u>, 962 F.Supp.2d at 778–79 (quoting <u>Gormont v. Astrue</u>, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal

requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony

22

regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis

for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C.   Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application in September of 2019 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency;

24

relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at
*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.
Judicial review of this aspect of ALJ decision-making is still guided by several
settled legal tenets. First, when presented with a disputed factual record, it is well-
established that "[t]he ALJ – not treating or examining physicians or State agency
consultants – must make the ultimate disability and RFC determinations." Chandler
v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating
medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence
for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d
Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision
is accompanied by an adequate, articulated rationale, it is the province and the duty
of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without
> crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);
> Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
> "SSR 96–2p does not prohibit the ALJ from crediting some parts of a
> treating source's opinion and rejecting other portions"); Connors v.
> Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
> 10, 2011). It follows that an ALJ can give partial credit to all medical
> opinions and can formulate an RFC based on different parts from the

26

different medical opinions. <u>See e.g.</u>, <u>Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

It is against these legal benchmarks that we assess the instant appeal.

**D.   <u>This Case Will Be Remanded for Further Consideration by the Commissioner.</u>**

As we have noted, it is axiomatic that an ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter</u>, 642 F.2d at 704. Furthermore, the ALJ must also "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck</u>, 181 F.3d at 433. In the instant case, we conclude that the ALJ's RFC determination is not supported by an adequate explanation, and we will remand the case for further proceedings.

In the instant case, the ALJ discounted the opinions of Bonk's treatment providers in favor of the opinions of the non-examining, state agency consulting opinions. In discounting these opinions, the ALJ relied heavily on what the ALJ described as the generally benign mental status evaluations during the relevant time,

which the ALJ found to be inconsistent with the marked and extreme limitations set forth by Ms. Yoder and Ms. Cummins. Instead, the ALJ found that the moderate limitations set forth by the state agency consultants were more consistent with these benign examination findings.

In our view, more is needed by way of an explanation on this score. While the record contains some notations of unremarkable clinical findings during the relevant period, such as intact attention and concentration, fluent speech, and coherent thought processes, the record is also replete with abnormal clinical findings, such as impaired judgment, insight, attention, and concentration. The ALJ failed to note or discuss these abnormal findings, and instead relied solely on the unremarkable findings to support the conclusion that Bonk was only moderately limited in the areas of functioning. However, as the Third Circuit has cautioned, when assessing a claimant's mental impairments, "[f]or a person . . . who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic." Morales, 225 F.3d at 319. Indeed, while Bonk's providers assessed what appeared to be unremarkable or benign clinical examination findings at times, these same providers opined that Bonk had marked to extreme limitations in many areas of functioning, including concentrating,

persisting, and maintaining pace, adapting, or managing oneself, and interacting with others.

Additionally, while the ALJ noted that Bonk was cooperative with her providers and, as such, found only a moderate limitation in interacting with others, the ALJ failed to discuss the treatment notes indicating that Bonk had difficulty interacting with others. Indeed, the record contains notes that indicate Bonk was tearful when interacting with others, and that she tried to volunteer on several occasions but became too anxious and had to leave. Ms. Bonk testified to these occasions as well, indicating that she avoids conversations with others because she becomes tearful and embarrassed. The ALJ appears to have relied on the fact that Bonk was able to leave her house and interact with others, noting briefly that she on occasion got out of her house. ((Tr. 86). However, the ALJ fails to mention the treatment notes that documented these occasions, which indicated that on several occasions, Bonk's anxiety forced her to return home when she tried to get out of the house.

The ALJ's failure to address, analyze or even acknowledge this body of clinical evidence which was consistent with treating source opinions stymies or review of Bonk's case on appeal. Simply put, we cannot determine whether the ALJ

discounted, ignored, or simply failed to recognize the relevance of this significant body of countervailing evidence.

Thus, while the ALJ was not required to accept these findings by these treating sources or afford these opinions any particular persuasiveness, the ALJ was required to adequately explain his reasoning for discounting these findings, which the ALJ failed to do in the instant case. Indeed, it is well settled that "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' " Morales, 225 F.3d at 317 (quoting Mason, 994 F.2d at 1066). Here, the ALJ rejected these opinions based on clinical findings, but did not discuss or explain how these clinical findings were indicative of the claimant's ability to perform work-related activities. As we have explained, "[f]or a person . . . who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic." Morales, 225 F.3d at 319. We find this explanation by the ALJ particularly unavailing since Bonk's treatment providers, as well as the examining source, Dr. Betts, found a range of marked to extreme limitations, and the unaddressed clinical evidence provides factual support for these medical opinions.

In our view, more is needed by way of an explanation.  Since the ALJ's burden of articulation is not met in the instant case, this matter must be remanded for further

consideration by the Commissioner. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

IV.   **Conclusion**

Accordingly, for the foregoing reasons, IT IS ORDERED that the plaintiff's request for a new administrative hearing is GRANTED, the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: July 25, 2023